IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOSEF HABER, an individual; PATRICK
GARRISON, an individual; JENNIFER
NICKOLAUS, an individual; CHRIS
WHALEY, an individual; JADE STRURMS,
an individual; on behalf of themselves and
all others similarly situated,

               Plaintiffs,

   v.

CITY OF PORTLAND, a municipal
corporation; MAYOR TED WHEELER, in
his individual capacity; retired PORTLAND
POLICE CAPTAIN LARRY GRAHAM,
in his individual capacity; PORTLAND
POLICE OFFICE RYAN LEE, in his
individual capacity; PORTLAND POLICE
OFFICER CHRIS LINDSEY, in his
individual capacity; PORTLAND POLICE
OFFICER JEFFREY MCDANIEL, in his
individual capacity, and PORTLAND
POLICE OFFICER JOSEPH SANTOS, in
his individual capacity,

               Defendants.
_____

Case No. 3:17-cv-01827-JR

FINDINGS AND
RECOMMENDATION

RUSSO, Magistrate Judge:

     Plaintiffs Josef Haber, Patrick Garrison, Jennifer Nickolaus, Chris Whaley, and Jade

Sturms filed this class action against defendants the City of Portland ("City"), Ted Wheeler,

Larry Graham, Ryan Lee, Chris Lindsey, Jeffrey McDaniel, and Joseph Santos alleging claims

under 42 U.S.C. § 1983 and state law arising out of a group detention effectuated by the Portland Police Bureau ("PPB"), in conjunction with other law enforcement agencies, on June 4, 2017. Defendants move for summary judgement pursuant to Fed. R. Civ. P. 56. Plaintiffs filed a partial cross-motion for summary judgment as to their claim under the Oregon Constitution. For the reasons set forth below, defendants' motion should be granted, plaintiffs' motion should be denied, and this case should be dismissed.

## BACKGROUND[1]

### I.    Events Leading up to the June 4, 2017, Protest

On May 14, 2017, Joey Gibson, the leader of Patriot Prayer, a far-right group often associated with white supremacy, white nationalism, and xenophobia, obtained a federal permit to hold a rally in downtown Portland at Terry Schrunk Plaza. The Patriot Prayer rally was scheduled for June 4, 2017 from 2:00 p.m. to 5:00 p.m. Graham Decl. ¶ 5 (doc. 89). Three adjacent counter-protests were scheduled in response to the Patriot Prayer rally – labor unions were anticipated in front of the Edith Green-Wendell Wyatt building, Portland Stands United Against Hate was anticipated in front of City Hall, and Rose City Antifa was anticipated in Chapman Square. Pls.' Resp. to Mot. Summ. J. 2 (doc. 113).

As the PPB's community liaison, Sergeant Jeffrey Niiya attempted to contact and form relationships with each protest group planning on participating in this event. Graham Decl. Ex. 3, at 1 (doc. 89); Niiya Decl. ¶¶ 4-5 (doc. 97). During these communications, Niiya expressed

---

[1] The Court generally cites to defendants' evidence except when referring to the non-duplicative information produced by plaintiffs. To the extent plaintiffs and defendants attack each other's recitation of facts, this Court is not bound by either party's characterization of the evidence and instead independently reviews the record to determine whether summary judgment is appropriate. Scott v. Harris, 550 U.S. 372, 380 (2007). This is especially true where, as here, the events in question are captured on videos that are not alleged to have been doctored or altered. Id. at 381. As such, only the facts borne out by the record are recounted herein.

concern that previous events hosted by Patriot Prayer had resulted in violence. Niiya Decl. ¶¶ 5-9 (doc. 97). He encouraged all groups to be vocal, but not violent, and reminded everyone that the police were neutral and not allied with any group. Id. The Patriot Prayer rally organizers told Niiya that they intended to march through the streets, which he discouraged because a significant number of people would be downtown, including persons attending the City Fair at Waterfront Park, as part of the City's Rose Festival celebrations. Id. at ¶ 6.

On May 26, 2017, three persons were stabbed and two killed on a MAX train in Portland, Oregon. First Am. Compl. ¶ 19 (doc. 45). The suspect arrested for the stabbings had previously attended a rally organized by Gibson and was associated with Patriot Prayer online. Wilker Decl. Ex. B, at 56 (doc. 87-2); Manlove Decl. Ex. 5, at 132 (doc. 94-5). As City Mayor, Wheeler publicly asked Gibson to cancel the June 4, 2017, Patriot Prayer rally and alternatively asked the federal government to revoke his permit; both requests were denied. Manlove Decl. Ex. 6, at 26-29 (doc. 94-6). PPB and members of the plaintiffs' class were concerned about the prospect of violence erupting due to heightened tensions between the groups. Manlove Decl. Ex. 5, at 72 (doc. 94-5); Manlove Decl. Ex. 6, at 27-29 (doc. 94-6); Manlove Decl. Ex. 7, at 25-26 (doc. 94-7); Manlove Decl. Ex. 9, at 13 (doc. 94-9); Manlove Decl. Ex. 10, at 11 (doc. 94-10); Niiya Decl. ¶ 10 (doc. 97).

The Federal Protective Service was largely responsible for managing the events at Terry Schrunk Plaza, whereas the PPB, in conjunction with other law enforcement agencies, were responsible for managing the three counter-protests. Wilker Decl. Ex. A, at 33-34 (doc. 87-1); Terry Decl. ¶ 5 (doc. 100). Graham was selected as the PPB Crowd Management Incident Commander for the June 4, 2017, event, meaning that he was the police official with authority and overall responsibility for managing the demonstrations. Graham Decl. ¶ 3 (doc. 89);

Manlove Decl. Ex. 4, at 43-44 (doc. 94-4). As Graham's Operations Section Chief, Lee was responsible for coordinating police resources during the event and communicating Graham's orders to officers on the ground, including Lindsey, McDaniel, and Santos. Lee Decl. ¶ 3 (doc. 91).

## II.    Early Afternoon Events of June 4, 2017

From approximately 12:30 p.m. until 1:00 p.m., the PPB sound truck made numerous announcements informing protesters that the streets were open to vehicular traffic and instructing them to stay out of the streets or be subject to arrest for disorderly conduct. Dale Decl. ¶ 4 & Ex. 1 (doc. 86); Manlove Decl. Exs. 11-12 (doc. 94). The announcements also advised protesters to stay within their respective parks. Dale Decl. ¶ 4 & Ex. 1 (doc. 86). At approximately 1:00 p.m., the PPB sound truck warned protesters that offensive actions may result in park closures. Id. at ¶ 5 & Ex. 1. Announcements directing the parties to remain in their respective parks and warning that offensive actions may result in park closures continued until 2:45 p.m. Id.

During the first few hours of the events on June 4, PPB's Emergency Operations Center ("EOC"), which was located off-site on the 15th Floor of the Justice Center,[2] received numerous reports of people attending or attempting to attend the protests with weapons, including wrist rockets, shields, police batons, crow bars, knives, brass knuckles, marbles, accelerants, bricks, and fireworks. Graham Decl. ¶ 8 (doc. 89); Manlove Decl. Ex. 7, 87-88 (doc. 94-7); Michaelson Decl. ¶¶ 7, 16-17, 21-22, 25-26, 34 & Ex. 40 (doc. 96). The EOC also received information that physical conflicts were planned or occurring between the groups in Chapman Square and Terry Schrunk Plaza. Michaelson Decl. ¶¶ 18, 22, 29-30, 33 & Ex. 40 (doc. 96). Officers were required

---

[2] Graham and Lee were at the EOC at all relevant times. Wilker Decl. Ex. A, at 39 (doc. 87-1); Graham Decl. ¶ 8 (doc. 89). Deputy City Attorney Jason Loos and Multnomah County Deputy District Attorney Haley Rayburn were also present. Graham Decl. ¶ 8 (doc. 89).

to separate the groups and Niiya asked Patriot Prayer's lead security person to move people into the interior of Terry Schrunk Plaza where they could no longer antagonize counter-protestors. Niiya Decl. ¶¶ 11-12 (doc. 97). Oregon State Police ("OSP") Officer Kenneth Terry also asked an organizer of the Patriot Prayer rally to move the group towards the center of Terry Schrunk Plaza in an effort to "de-escalate the situation." Terry Decl. ¶ 6 (doc. 100).

During the afternoon, projectiles (such as bricks, ball bearings shot from wrist rockets, rocks, fireworks, used tampons, water bottles, and water balloons filled with feces and urine) were continuously being thrown from Chapman towards Terry Schrunk Plaza. Id. at ¶¶ 6-7; Hughes Decl. Exs. 41-42 (doc. 90); Manlove Decl. Ex. 7, at 87-89 (doc. 94-7); Manlove Decl. Ex. 15, at 39-41, 46 (doc. 94-15); Niiya Decl. ¶¶ 13-14 (doc. 97); Bailey Decl. ¶ 6 (doc. 99). Shortly after 3:00 p.m., officers along Southwest Madison Street saw individuals climb on top of the restroom in Chapman Square, unloading bricks out of backpacks to hang a banner. Manlove Decl. Ex. 17 (doc. 94-17); McDaniel Decl. ¶ 4 (doc. 95); Pool Decl. ¶ 5 (doc. 98); Terry Decl. ¶ 7 (doc. 100).

At 3:17 p.m., Graham directed PPB officers to close the south half of Chapman Square due to criminal activity including throwing various items at the police. Manlove Decl. Ex. 4, at 94 (doc. 94-4); Michaelson Decl. ¶ 37 (doc. 96); Bailey Decl. ¶ 7 (doc. 99); Terry Decl. ¶ 8 (doc. 100). The goal was to provide a greater distance between the Patriot Prayer rally and the counter-protestors located in Chapman. Graham Decl. Ex. 3, at 2 (doc. 89-3); Manlove Decl. Ex. 4, at 68-70, 73-74 (doc. 94-4); Manlove Decl. Ex. 7, at 96 (doc. 94-7); Manlove Decl. Ex. 15, at 49 (doc. 94-15); Pool Decl. ¶ 6 (doc. 98). The PPB sound truck began announcing the closure of the south side of Chapman Square and directing protesters to move to the center of the park. Dale Decl. ¶ 8 & Ex. 1 (doc. 86); Terry Decl. ¶ 8 (doc. 100). Because many protesters did not respond to this

order within several minutes, despite indicating they had heard the order by "yelling obscenities and waving their hands" or booing, police officers on the ground began to slowly move the police line north through the park. Manlove Decl. Ex. 7, at 97 (doc. 94-7); Manlove Decl. Ex. 21 (doc. 94); Michaelson Decl. ¶¶ 37, 39-41 (doc. 96); Terry Decl. ¶ 8 (doc. 100).

While some protesters moved back, and others dispersed away from the park, a number within the crowd actively resisted police efforts and/or directed projectiles towards officers, including bricks, fireworks, pipes, bottles, rocks, and full soda cans. Manlove Decl. Ex. 7, at 100 (doc. 94-7); Manlove Decl. Ex. 15, at 53 (doc. 94-15); Michaelson Decl. ¶¶ 42-45 (doc. 96); Pool Decl. ¶ 7 & Ex. 49 (doc. 98); Bailey Decl. ¶ 8 (doc. 99); Terry Decl. ¶ 9 (doc. 100). In response, police deployed "long baton techniques" and fired pepper balls and flashbangs into the crowd. Wilker Decl. Ex. D, at 39 (doc. 87-4); Wilker Decl. Ex. E, at 43 (doc. 87-5); Manlove Decl. Ex. 21A (doc. 94); Bailey Decl. ¶ 10 (doc. 99); Terry Decl. ¶ 9 (doc. 100).

At 3:34 p.m. the EOC received information that persons in the crowd at Chapman were forming a human shield in the middle of the park. Manlove Decl. Ex. 7, at 103-04 (doc. 94-7); Michaelson Decl. ¶ 46 & Ex. 40 (doc. 96).

Graham resolved that the assembly had become unlawful, ordering that the park be closed, and the crowd dispersed. Manlove Decl. Ex. 4, at 68, 73-74 (doc. 94-4); Manlove Decl. Ex. 7, at 100, 103 (doc. 94-7); Bailey Decl. ¶ 11 (doc. 99); Terry Decl. ¶ 10 (doc. 100). Between 3:28 p.m. and 3:44 p.m., the PPB sound truck announced "that the assembly had become unlawful" 20 times. Dale Decl. ¶¶ 9-10 & Ex. 1 (doc. 86); Terry Decl. ¶ 10 (doc. 100). Subsequently, the sound truck announced that Chapman Square was closed and directed people to disperse the area or be subject to arrest. Dale Decl. ¶¶ 9-12 & Ex. 1 (doc. 86). When the police

line reached the edge of Chapman Square at Southwest Main Street, the officers stopped. Bailey Decl. ¶ 12 (doc. 99); Terry Decl. ¶ 11 (doc. 100).

The EOC received information that large numbers of protesters still had not dispersed the area, some of whom were placing objects and barricades in the street and continuing to throw projectiles and objects at the police. Hughes Decl. ¶ 7 & Ex. 44 (doc. 90); Michaelson Decl. ¶¶ 48, 50-53 & Ex. 40 (doc. 96). Graham made the decision to close Lownsdale Square. Manlove Decl. Ex. 4, at 68 (doc. 94-4); Manlove Decl. Ex. 7, at 113 (doc. 94-7); Terry Decl. ¶¶ 10-11 (doc. 100).

At 3:55 p.m., the PPB sound truck announced that both Lownsdale and Chapman Squares were closed, and individuals were directed to disperse to the north or be subject to arrest. Dale Decl. ¶ 13 & Ex. 1 (doc. 86); Terry Decl. ¶¶ 10-11 (doc. 100); Wilker Decl. Ex. R, at 4 (doc 114-1). The PPB sound truck made this announcement 10 times between 3:55 p.m. and 4:14 p.m. Dale Decl. ¶ 13 & Ex. 1 (doc. 86). While many people followed this directive and exited via the "passable" sidewalks, hundreds remained gathered in and around Lownsdale Square. Id.; Terry Decl. ¶¶ 11-12 (doc. 100). Graham requested that these individuals be detained and arrested, however, both the OSP and PPB indicated that there were not enough police resources at that time to surround the park and effectuate arrests. Manlove Decl. Ex. 7, at 101 (doc. 94-7); Terry Decl. ¶ 11 (doc. 100).

III.    **The March and Subsequent Mass Detention**[3]

Just after 4:00 p.m., the EOC received reports that people were trying to motivate the crowd to march. Michaelson Decl. ¶ 56 & Ex. 40 (doc. 96). Shortly thereafter, many individuals left Lownsdale and took to the street; officers paralleled the group. Manlove Decl. Ex. 7, at 121 (doc. 94-7); Manlove Decl. Ex. 15, at 67 (doc. 94-15); McDaniel Decl. ¶ 5 (doc. 95); Bailey Decl. ¶¶ 12, 14 (doc. 99); Terry Decl. ¶ 13 (doc. 100). This group of 80 to 100 people initially walked in the middle of Southwest 2nd Avenue before looping back towards the park and ultimately heading west up Southwest Salmon Avenue at approximately 4:13 p.m., at which point some of the plaintiffs joined the crowd. Hughes Decl. Exs. 45-46 (doc. 90); Manlove Decl. Ex. 9, at 53 (doc. 94-9); Manlove Decl. Ex. 10, at 63, 65 (doc. 94-10); Manlove Decl. Exs. 23-24 (doc. 94); Manlove Decl. Ex. 25, at 68-69 (doc. 94-25); Michaelson Decl. ¶¶ 57-60 & Ex. 40 (doc. 96); Bailey Decl. ¶ 12 (doc. 99). A police blockade at Southwest 5th Avenue and

---

[3] While plaintiffs argue that disputed issues of material fact exist concerning whether "the detention became an arrest," the Court finds that, given the particular facts of this case, no arrest occurred. Pls.' Resp. to Mot. Summ. J. 23 (doc. 113); see also United States v. Sharpe, 470 U.S. 675, 686 (1985) (rejecting "a hard-and-fast time limit for a permissible" stop and instead indicating that courts should consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly"). Significantly, as discussed below, officers did not draw or display their weapons, acted as expeditiously as possible given the number of detainees, and released individuals as soon as identification was provided; plaintiffs' class was also free to move around the area, use their phones, and speak with others present. Although not dispositive, the record intimates that plaintiffs subjectively understood they were not being arrested. See, e.g., Manlove Decl. Ex. 9, at 90 (doc. 94-9); Manlove Decl. Ex. 34 (doc. 94-34). As such, the Court employs the term "detention" or "kettle" consistently throughout this Findings and Recommendation in order to describe defendants' allegedly unlawful act, and also applies the reasonable suspicion standard, which requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity . . . Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence," and obviously less than is necessary for probable cause." Navarette v. California, 572 U.S. 393, 396-37 (2014) (citations and internal quotations omitted).

Page 8 – FINDINGS AND RECOMMENDATION

Southwest Salmon Street rerouted the individuals back to Southwest 4th Avenue.[4] Manlove Decl. Exs. 23-25A (doc. 94).

At 4:14 p.m., the EOC received information that a large group of people were headed north on Southwest 4th Avenue. Michaelson Decl. ¶ 62 & Ex. 40 (doc. 96). Between 4:16 p.m. and 4:19 p.m., the EOC received information that 200 to 300 people were marching in the street on Southwest 4th Avenue between Southwest Yamhill and Taylor Streets. Id. at ¶¶ 63-64; Hughes Decl. Ex. 47 (doc. 90); Manlove Decl. Exs. 24, 27 (doc. 94).

Given that "no person or organization had obtained a permit to march in any City street on June 4, 2017," Graham directed officers on the ground to detain the individuals who were marching in the street in order to investigate the disorderly conduct stemming from the purported violence in the parks and unpermitted street march. Graham Decl. ¶¶ 10-14, 17 (doc. 89); Manlove Decl. Ex. 4, at 74-75, 83-84, 130-31 (doc. 94-4); Bailey Decl. ¶ 15 (doc. 99); Terry Decl. ¶¶ 13-14 (doc. 100). OSP officers formed a line across Southwest 4th Avenue at Southwest Alder Street and PPB officers formed a line across Southwest 4th Avenue at Southwest Morrison Street.[5] Manlove Decl. Ex. 15, at 68 (doc. 94-15); Terry Decl. ¶¶ 13-14 (doc. 100). A few

---

[4] Although all roads in the downtown core technically remained open to vehicular traffic, PPB had closed off two lanes of Southwest 4th Avenue in front of City Hall and police and protestor-made blockades existed on portions of Southwest 2nd, 4th, and 5th Avenues. Wilker Decl. Ex. A, at 72 (doc. 87-1); Manlove Decl. Ex. 4, at 104 (doc. 94-4); Manlove Decl. Ex. 7, at 116-17 (doc. 94-7); Manlove Decl. Ex. 25, at 66-67, 78 (doc. 94-25); Terry Decl. ¶ 13 (doc. 100); Wilker Decl. Ex. S, at 72 (doc. 114-2); Wilker Decl. Ex. X, at 34, 40 (doc. 114-7); Wilker Decl. Ex. Y, at 114 (114-8); see also Wilker Decl. Ex. W, at 51-53 (doc. 114-6) (Lindsey testifying that traffic was "fairly light" on Southwest 2nd Avenue, Southwest 4th Avenue, and Southwest Main Street due to the police presence surrounding the protests).

[5] Terry made the tactical decision to stop and detain the crowd at this location. Terry Decl. ¶ 16 (doc. 100). Graham was not involved in this determination. Graham Decl. ¶ 18 (doc. 89); Manlove Decl. Ex. 15, at 71 (doc. 94-15). To the east there was a parking garage; to the west, at the northern end of the block, there was a business that seemed to be closed. Terry Decl. ¶ 16 (doc. 100). Although there was a Starbucks at the southwest corner of the block, Terry did not recall seeing anyone exit that establishment and thought it was unlikely that they would "detain

individuals attempted to escape the kettle through the adjacent parking garage; police fired pepper balls at and used "long batons to strike" these individuals. Wilker Decl. Ex. E, at 94 (doc. 87-5); Bailey Decl. ¶ 17 (doc. 99); Terry Decl. ¶ 19 (doc. 100).

At 4:20 p.m., approximately 400 people were detained.[6] Michaelson Decl. ¶ 66 (doc. 96). At 4:23 p.m., the PPB sound truck announced that people were being detained to investigate disorderly conduct and arrests would be based on probable cause. Dale Decl. ¶ 14 & Ex. 1 (doc. 86); Bailey Decl. ¶ 18 (doc. 99). While kettled, plaintiffs were not handcuffed and remained free to walk within the area, speak with friends or legal observers, and use their phones. Manlove Decl. Ex. 9, at 82, 84-85 (doc. 94-9); McDaniel Decl. ¶ 6 (doc. 95). PPB officers supplied water. Manlove Decl. Ex. 4, at 113-14 (doc. 94-4). A number of those detained abandoned weapons and clothing into the street and onto the sidewalk. Manlove Decl. Ex. 17A, at 87-89; Manlove Decl. Ex. 9, at 86-87 (doc. 94-9); Manlove Decl. Ex. 28, at 154-55 (doc. 94-28); Manlove Decl. Exs. 29-30 (doc. 94); Michaelson Decl. ¶ 70 & Ex. 40 (doc. 96); Bailey Decl. ¶ 19 (doc. 99); Terry Decl. ¶ 22 (doc. 100).

Between 4:30 p.m. and 5:12 p.m., the PPB sound truck announced: "Everyone being detained for disorderly conduct will be identified. Please have your identification ready and you will be processed three at a time following orders from the officers. Your cooperation will speed the process." Dale Decl. ¶ 15 & Ex. 1 (doc. 86).

---

persons unassociated with the group coming from the parks and marching in the street" at this location. Id. At one point a car exited the parking garage, and Terry and his squad allowed the car to leave the area. Id.

[6] The City's Independent Police Review report ("IPR Report") states there were 389 people detained. Wilker Decl. Ex. Z, at 9 (doc. 114-9). Yet the deposition and other evidence suggests the number may have been as high as 435. See, e.g., Manlove Decl. Ex. 28, at 86 (doc. 94-28).

Twelve PPB officers were involved in the simultaneous processing of the detainees. Manlove Decl. Ex. 28, at 108 ([doc. 94-28](#)). This was accomplished by photographing individual persons, their identification, and their clothing, rather than writing down and recording everyone's information.[7] Id. at 78-81; Terry Decl. ¶ 20 ([doc. 100](#)). None of the plaintiffs were searched and no further investigation was conducted beyond identifying the individuals present. Wilker Decl. Ex. J, at 56 ([doc. 87-10](#)); Manlove Decl. Ex. 9, at 92 ([doc. 94-9](#)); Manlove Decl. Ex. 17A, at 97 ([doc. 94-17](#)); Manlove Decl. Ex. 22, at 120 ([doc. 94-22](#)); Manlove Decl. Ex. 25, at 110 ([doc. 94-25](#)); Terry Decl. ¶ 20 ([doc. 100](#)).

After approximately an hour, all the detainees had been processed and left the area. Graham Decl. Ex. 3, at 2 ([doc. 89-3](#)); Manlove Decl. Ex. 9, at 91 ([doc. 94-9](#)); McDaniel Decl. ¶ 6 ([doc. 95](#)); Michaelson Decl. ¶ 72 ([doc. 96](#)); Terry Decl. ¶ 21 ([doc. 100](#)). Four or five individuals were arrested based on their behavior at the detention site or other offenses committed at Chapman or Lownsdale Squares. Graham Decl. Ex. 3, at 2 ([doc. 89-3](#)); Terry Decl. ¶ 21 ([doc. 100](#)).

## IV.    Proceedings Before This Court

On November 15, 2017, plaintiffs initiated this lawsuit. On May 31, 2018, the Court certified plaintiffs' class as follows:

> All individuals who were assembled on Southwest Fourth Avenue between Southwest Morrison Street and Southwest Alder Street in Portland, Oregon on the afternoon of June 4, 2017, and who were contained and prevented from leaving

---

[7] The decision to process detainees in this manner was made by Santos and Terry. Manlove Decl. Ex. 28, at 78-81, 137-38 ([doc. 94-28](#)); Terry Decl. ¶ 20 ([doc. 100](#)). Graham was not involved in that decision and learned of it after the fact. Graham Decl. ¶ 18 ([doc. 89](#)). Santos and Terry believed that photographing the person and their identification could save time and be used by PPB investigators to review video taken of the crowd in Chapman and Lownsdale Squares, in the street marching, or for other criminal conduct observed elsewhere in the day by PPB detectives. Manlove Decl. Ex. 28, at 138 ([doc. 94-28](#)); Terry Decl. ¶ 20 ([doc. 100](#)).

by officers of the Portland Police Bureau, along with other law enforcement officers.

Order 1-2 (doc. 39).

Plaintiffs filed an amended complaint on August 24, 2018, alleging: (1) deprivation of Fourth Amendment rights in violation of 42 U.S.C. § 1983 against Wheeler and the individual PPB officers; (2) violation of the Oregon Constitution, Article I, Section 9's prescription against unreasonable seizures against Wheeler and individual PPB officers; (3) unconstitutional policy, custom, or practice of depriving Fourth Amendment rights in violation of 42 U.S.C. § 1983 against the City; and (4) unconstitutional policy, custom, or practice of violating the Oregon Constitution, Article I, Section 9's prescription against unreasonable seizures against the City.[8] First Am. Compl. ¶¶ 47-57 (doc. 45). Plaintiffs seek declaratory relief as to all claims, in addition to compensatory or nominal damages in regard to their first claim. Id.

During the beginning of 2020, it appeared as though the parties had at least preliminarily settled their dispute. However, due to breakdowns in the settlement process and the resurgence of protests surrounding the death of George Floyd, the parties decided to proceed in this case on the merits. See, e.g., Notice of Termination of Settlement Negotiations 1-2 (doc. 76).

On August 21, 2020, the parties filed the present summary judgment motions. Briefing on those motions was completed on October 16, 2020.

---

[8] Plaintiffs' also assert their 42 U.S.C. § 1983 claims under the Fourteenth Amendment's Due Process Clause. First Am. Compl. ¶¶ 49, 54 (doc. 45); Pls.' Resp. to Mot. Summ. J. 9 (doc. 113). However, it is well-established that, if a constitutional claim "is covered by a specific constitutional provision," it should not be analyzed under due process. United States v. Lanier, 520 U.S. 259, 272 n.7 (1997); see also Picray v. Sealock, 138 F.3d 767, 770 (9th Cir. 1998) ("the validity of an arrest must be analyzed under Fourth Amendment standards, not due process standards").

**STANDARD OF REVIEW**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

**DISCUSSION**

This dispute centers on whether defendants violated plaintiffs' state and federal constitutional rights. In regard to plaintiffs' declaratory relief claims, defendants argue they are not justiciable. Defs.' Mot. Summ. J. 28-32 (doc. 84). Defendants assert that, even if subject matter jurisdiction exists, plaintiffs' claims fail because there is no underlying unconstitutional policy, custom, or practice, and the individual officers' conduct was reasonable or, alternatively, the right at issue was not clearly established. Id. at 34-62.

Plaintiffs oppose defendants' motion on the basis that myriad purported issues of material fact exist. Pls.' Resp. to Mot. Summ. J. 10-32 (doc. 113). In addition, plaintiffs contend they are entitled to summary judgment on their claim under state law because the Oregon Constitution requires "individual reasonable suspicion" in order to effectuate a detention or arrest, which was lacking in this case. Pls.' Partial Mot. Summ. J. 6-7 (doc. 85).

## I.   Preliminary Matters

Before reaching the substantive merits of city defendants' motion, the Court must address three preliminary matters: plaintiffs' evidentiary objection, whether Wheeler is a proper defendant, and the lawfulness of defendants' decision to close Chapman and Lownsdale Squares.

### A.   Plaintiffs' Evidentiary Objection

Plaintiffs "object to and move to strike the declarations and supporting exhibits of Kelsey Lloyd and Tiffany Lynn" because neither "were identified as witnesses as required by Fed. R. Civ. P. 26(a) or (e)." Pls.' Resp. to Mot. Summ. J. 6 (doc. 113).

Defendants initially argue that plaintiffs failed to confer in regard to their evidentiary objections pursuant to LR 7-1(a)(1)(A). However, because Local Rule 56-1(b) authorizes a party to "address the objection in its reply memorandum," which defendants have done here, the Court declines to deny plaintiffs' evidentiary objection on this basis. In any event, without "waiving their objections under LR 7-1(a)(1)(A) or any future objections," defendants agree to withdraw the Lloyd and Lynn declarations.[9] Defs.' Reply to Mot. Summ. J. 16 (doc. 124). Accordingly, plaintiff's evidentiary objection is denied as moot.

---

[9] Defendants re-introduce the exhibits to the Lynn declaration as part of Terry's supplemental declaration, because he also had personal knowledge of the videos in question. Suppl. Terry Decl. ¶¶ 5-6 (doc. 125); see also United States v. Taibi, 2012 WL 553143, *4 (S.D. Cal. Feb. 21, 2012) (court may consider evidence, even new evidence, that rebuts arguments raised by the plaintiff in her opposition to the defendant's summary judgment motion); Schiewe v. Serv.

**B.    Defendant Ted Wheeler**

Defendants argue that "Wheeler did not participate, approve, or have any opportunity to intervene in the decision to detain the plaintiff class," such that the claims against him should be dismissed. Defs.' Mot. Summ. J. 1 (doc. 84).

Plaintiffs' opposition is silent as to this issue and, in fact, does not address Wheeler's purported actions at any point, other than to note briefly as part of their recitation of facts that he was more concerned about the Patriot Prayer rally "in light of the MAX murders" and "was present in the command center during the protests." Pls.' Resp. to Mot. Summ. J. 2-3 (doc. 113); see also Justice v. Rockwell Collins, Inc., 117 F.Supp.3d 1119, 1134 (D. Or. 2015), aff'd, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes . . . the court may treat that argument as conceded") (citation and internal quotations and brackets omitted).

In any event, the unrefuted evidence of record demonstrates that Wheeler was present in the EOC during the early part of the protest but did not have any involvement in Graham's decision-making process or the events on the ground. See Walsh v. City of Portland, 2018 WL 5621959, *3-4 (D. Or. Oct. 30, 2018) (claims against Wheeler in his individual capacity were not plausible where the plaintiff did "not specifically allege that Wheeler personally took part in the alleged deprivation of his rights [on June 4, 2017], or that Wheeler knew of the alleged deprivations and failed to prevent them").

In fact, the testimony is consistent that Wheeler was present solely as an observer and spent most of his time in a room adjacent to the EOC. Manlove Decl. Ex. 6, at 9, 11, 34-35, 39-

---

Emp'rs Int'l Union Local 503, 2020 WL 4251801, *4 n.5 (D. Or. July 23), adopted by 2020 WL 5790389 (D. Or. Sept. 28, 2020) ("there are no hearsay concerns where, as here, the affiant is testifying from personal knowledge") (citing Calmat Co. v. U.S. Dep't of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004)).

40, 47-48 (doc. 94-6). He exchanged brief pleasantries with some of the individuals present but did not talk strategy and played no decision-making role. Id.; Manlove Decl. Ex. 4, at 40 (doc. 94-4); Manlove Decl. Ex. 7, at 72-73 (doc. 94-7). Graham was not sure whether Wheeler was informed of the decision to effectuate the detention or was even present at the time that decision was made. Manlove Decl. Ex. 4, at 122-123 (doc. 94-4); see also Manlove Decl. Ex. 6, at 45, 64 (doc. 94-6) (Wheeler testifying that he was not aware police had detained plaintiffs' class at the time he left the EOC and read about it after the fact). Defendants' motion should therefore be granted in this regard and Wheeler should be dismissed as a defendant from this action.

### C.      Lawfulness of Closing Chapman/Lownsdale and Rendering Dispersal Orders

While not central to their claims given the class' confines, plaintiffs repeatedly question the lawfulness of defendants' decision to close Chapman and Lownsdale Squares. See, e.g., Pls.' Resp. to Mot. Summ. J. 3 (doc. 113). Because this event serves as important background leading up to plaintiffs' detention, the Court briefly addresses this argument.

Plaintiffs' contention appears to be premised on the fact that none of the plaintiffs threw objects, and some did not even observe projectiles being thrown from Chapman Square. Manlove Decl. Ex. 25, at 58-59 (doc. 94-25); Wilker Decl. Ex. T, at 32 (doc. 114-3); Nickolaus Decl. ¶ 8 (doc. 115); Garrison Decl. ¶ 5 (doc. 116); Whaley Decl. ¶ 5 (doc. 117); Haber Decl. ¶ 5 (doc. 118); Sturms Decl. ¶ 2 (doc. 119); see also Manlove Decl. Ex. 22, at 60-61 (doc. 94-22) (Haber testifying that he did not immediately comply with police orders to disperse because "I hadn't witnessed any of the illegal acts the police were saying were committed, I felt the order was bogus, and I was there to protest that kind of action"). Plaintiffs also suggest that defendants' decision to close Chapman and Lownsdale Squares evinces favoritism towards the

Page 16 – FINDINGS AND RECOMMENDATION

Patriot Prayer rally.[10] See Pls.' Resp. to Mot. Summ. J. 3, 24, 30 (doc. 113) (the "true purpose of detaining the Class for an hour was not to investigate anything, but to make time for Terry Schrunk Plaza to clear").

Yet, as defendants correctly note and as described at length above, "[t]he anti-police violence at Chapman is undisputed and well documented." Defs.' Reply to Mot. Summ. J. 29 (doc. 184). Similarly, the evidence showing that many protestors failed to move back once the southern portion of Chapman Square was closed is undisputed and well documented. See, e.g., Manlove Decl. Ex. 7, at 100 (doc. 94-7); Manlove Decl. Ex. 15, at 53 (doc. 94-15); Michaelson Decl. ¶¶ 42-45 (doc. 96); Pool Decl. ¶ 7 & Ex. 49 (doc. 98); Bailey Decl. ¶ 8 (doc. 99); Terry Decl. ¶ 9 (doc. 100).

Given these circumstances, the fact that plaintiffs may not have thrown any objects or witnessed any objects being thrown is insufficient to meaningfully contest the propriety of defendants' actions in closing half, and then all, of the park and ordering protestors therein to disperse. See Or. Rev. Stat. § 131.675 ("[w]hen any five or more persons, whether armed or not, are unlawfully or riotously assembled [police] shall go among the persons assembled, or as near to them as they can with safety, and command them in the name of the State of Oregon to disperse. If, so commanded, they do not immediately disperse, the officer must arrest them or

---

[10] The only evidence that plaintiffs cite in support of this proposition is a "Situation Status Report" from the day in question, which states, amongst a list of "Current Actions as of 1530 hours": "Patriot group being encouraged to leave Schrunk while anarchist group being distracted." Wilker Decl. Ex. A, at 127 (doc. 87-1); Wilker Decl. Ex. O, at 2 (doc. 87-15). Given the other evidence of record, this sole reference, which appears to pertain to a period approximately 50 minutes prior to the kettle, is inadequate to establish an ulterior motive. Cf. Devenpeck v. Alford, 543 U.S. 146, 153-54 (2004) ("an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause . . . the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action") (citations and internal quotations omitted).

cause them to be arrested"). Stated differently, irrespective of whether the Court or plaintiffs take exception to defendants' decisions surrounding Chapman and Lownsdale on the day in question, because the police were acting well within their authority, these facts cannot (and, in fact, do not based on the operative pleading)[11] form a basis of liability. By extension, however, any purported reasonable suspicion related to the events that transpired in Chapman or Lownsdale does not support plaintiffs' detention, which was temporally and geographically distinct.

I.     **Declaratory Relief Claims**

With the exception of portions of their first claim, plaintiffs seek exclusively declaratory relief related to the events that occurred on June 4, 2017. Specifically, plaintiffs' first and second claims seek declarations that one or more of the individual defendants violated the rights of the class under the Fourth Amendment of the U.S. Constitution and/or Article I, Section 9, of the Oregon Constitution. Plaintiffs' third and fourth claims seek identical relief, except in regard to an allegedly unconstitutional City policy, custom, or practice.

Defendants maintain that plaintiffs lack standing to pursue retrospective declaratory relief because the harm has ceased and is not capable of repetition by these individual officers, and any prospective declaratory relief is moot for the same reasons.[12] Defs.' Mot. Summ. J. 28-32 (doc. 84).

---

[11] Indeed, while plaintiffs repeatedly decry the lawfulness of defendants' decision to close the park and employ force therein, they are quick to note that "[s]ome of the Class members were never even in Chapman Park on June 4, 2017." Pls.' Resp. to Mot. Summ. J. 10 (doc. 113); but see Manlove Decl. Ex. 9, at 56-59, 61 (doc. 94-9) (Garrison testifying that the "people comprised of the march" were "primarily people that were originally from Chapman and Lownsdale").

[12] Plaintiffs do not address the justiciability of their third and fourth claims premised on an unconstitutional policy, custom, or practice. See generally Pls.' Resp. to Mot. Summ. J. (doc. 113); see also Madlaing v. JPMorgan Chase Bank, N.A., 2013 WL 2403379, *16 (E.D. Cal. May 31, 2013) (the plaintiff's failure "to address defendants' points as to his lack of standing to seek

Plaintiffs, in contrast, assert that "the possibility of recovering damages [in regard to their first claim under federal law] does not make declaratory relief superfluous" and state that standing exists because they have a "legally protected interest in not being subject to unreasonable seizure." Pls.' Resp. to Mot. Summ. J. 6-7 (doc. 113). Additionally, plaintiffs contend "[d]eclaratory relief on the first claim for relief is particularly appropriate here because of the possibility that Defendants might be entitled to qualified immunity for their actions and thus escape liability for damages." Id. at 7. Concerning their second claim under state law, plaintiffs argue that Or. Rev. Stat. § 14.175 confers justiciability by "provid[ing] for an exception to mootness for cases of public importance that were capable of repetition yet evading review." Id. at 8-9 (citing Pendleton School Dist. 16R v. State, 345 Or. 596, 200 P.3d 133 (2009); and Couey v. Atkins, 357 Or. 460, 355 P.3d 866 (2015)).

Declaratory relief is generally appropriate: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Bilbrey by Bilbrey v. Brown, 738 F.2d 1462, 1470 (9th Cir. 1984) (citation and internal quotations omitted). However, federal courts are courts of limited jurisdiction, such that, in order to proceed in this forum, the plaintiff's claims must present an active case or controversy. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotations omitted). To meet this requirement, the plaintiff bears the burden of "demonstrat[ing] that the requisite threat of future harm actually exists." Nelsen v. King Cty., 895 F.2d 1248, 1251 (9th Cir. 1990) (citations and internal quotations omitted). Namely, "throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant

---

declaratory relief" can be construed as a "concession that he lacks standing to seek declaratory relief").

and likely to be redressed by a favorable judicial decision." Spencer v. Kemna, 523 U.S. 1, 7 (1998) (citation and internal quotations omitted); see also Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (in order to be redressable, the injury in fact must be both "actual and imminent," and not conjectural or hypothetical) (citation omitted).

Thus, claims for equitable relief are not justiciable "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Rosebrock v. Mathis, 745 F.3d 963, 971 (9th Cir. 2014) (citation and internal quotations omitted); see also Alaska Ctr. for Env't v. U.S. Forest Serv., 189 F.3d 851, 854-55 (9th Cir. 1999) (narrow "capable of repetition yet evading review" exception to the mootness doctrine applies only if, amongst other criteria, "there is a reasonable expectation that the plaintiffs will be subjected to [the challenged conduct] again"); Spencer, 523 U.S. at 18 (federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong"); Bayer v. Neiman Marcus Grp., Inc., 861 F.3d 857, 868 (9th Cir. 2017) ("[a] declaratory judgment merely adjudicating past violations of federal law – as opposed to continuing or future violations of federal law – is not an appropriate exercise of federal jurisdiction").

In short, a federal court is not empowered to issue "retrospective declaratory relief with respect to allegedly unconstitutional conduct that has ended" or prospective declaratory relief with respect to allegedly unconstitutional conduct that is not sufficiently likely to reoccur. Rodriguez v. Tilton, 2015 WL 3507126, *2 (E.D. Cal. June 3, 2015); see also City of L.A. v. Lyons, 461 U.S. 95,  107 n.8 (1983) ("[i]t is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions") (emphasis removed).

Here, plaintiffs' request for declaratory relief against the individual defendants and the City is not intended to and cannot address ongoing or future violations of federal or state law. Rather, plaintiffs' briefing makes clear that they are asking the Court for a retroactive opinion that the individual officers or the City previously violated their rights, irrespective of any additional claim for damages or the potential availability of qualified immunity for the individual officers. See Pls.' Resp. to Mot. Summ. J. 6-7 (doc. 113) (plaintiffs' identifying their "injury in fact [as the moment] when the individual Defendants violated their legally protected interest in not being subject to unreasonable seizure" on June 4, 2017); see also Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 847 n.5 (9th Cir. 2002) (declaratory relief is "retrospective to the extent that it is intertwined with a claim for monetary damages that requires [courts] to declare whether a past constitutional violation occurred . . . declaratory relief [in such a situation] is superfluous in light of the damages claim") (citation and internal quotations omitted); Tarhuni v. Holder, 8 F.Supp.3d 1253, 1267-68 (D. Or. 2014) ("a plaintiff who has standing to seek damages for a past injury . . . does not necessarily have standing to seek prospective relief such as a declaratory judgment," such that "[i]t is necessary for a plaintiff to demonstrate standing separately for each form of relief sought") (citations and internal quotations omitted).

Yet, given the well-established precedent cited above, this Court lacks authority to render any such relief. The case that plaintiffs rely on – i.e., Bilbrey – does not dictate a different result, as it involved potential future harm and therefore did not address the constitutional requirements of standing for declaratory actions. Bilbrey, 738 F.2d at 1464-65, 1471; see also Vietnam Veterans of Am. v. Cent. Intelligence Agency, 2010 WL 291840, *6 (N.D. Cal. Jan. 19, 2010) (explaining that Bilbrey did not involve "a challenge to the plaintiffs' standing to seek declaratory relief; instead, [it] inquired into whether the district courts properly exercised their

discretion in denying such relief"); Lujan, 504 U.S. at 564 ("[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding [equitable relief] if unaccompanied by any continuing, present adverse effects") (citation and internal quotations omitted).

Regarding plaintiffs' argument concerning their second claim, it is axiomatic that "standing in federal court is a question of federal law." Hollingsworth v. Peny, 570 U.S. 693, 715 (2013); see also Lee v. Am. Nat'l Ins. Co., 260 F.3d 997, 1001-02 (9th Cir. 2001) ("a plaintiff whose cause of action is perfectly viable in state court under state law may nonetheless be foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the requisite injury"); Taylor v. Nike, Inc., 2017 WL 663056, *3 (D. Or. Feb. 17, 2017) (the plaintiff lacked standing to pursue injunctive relief in federal court even where state law expressly granted such a remedy). Plaintiffs cite no authority that belies this conclusion[13] or otherwise suggests that Oregon cases or statutes can create jurisdiction in the federal court where none otherwise exists. Accordingly, state law is inapplicable to the Court's analysis of plaintiffs' standing in this forum.

Moreover, plaintiffs have not provided any basis for prospective declaratory relief. In fact, plaintiffs do not meaningfully address defendants' argument concerning this issue. See generally Pls.' Resp. to Mot. Summ. J. (doc. 113). At most, portions of the record not cited by

---

[13] The precedent cited by plaintiffs involved Oregon courts evaluating their own jurisdiction under Oregon law. In any event, both cases are factually distinct: Pendleton concerned the confines of a current constitutional provision and Couey involved election-based claims that were capable of repetition yet evading review. See Pendleton, 345 Or. at 606 ("[t]he issue whether Article VIII, section 8, imposes a duty on the legislature to fund the public school system at a specified level every biennium presents a set of present facts regarding the interpretation of a constitutional provision; it is not simply an abstract inquiry about a possible future even"); Couey, 357 Or. at 467-522 (although speculative, the plaintiff's otherwise moot declaratory judgment claim could proceed under Or. Rev. Stat. § 14.175).

plaintiffs in their opposition indicate that some members of the class "remain very concerned about the Portland Police Bureau targeting [them] and other protestors for detention or arrest without probable cause or reasonable suspicion for exercising [their] state and federal constitutional rights to freedom of speech and freedom of assembly." Nickolaus Decl. ¶ 10 (doc. 115); Garrison Decl. ¶ 6 (doc. 116); Sturms Decl. ¶ 3 (doc. 119); but see Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (district court need not "scour the record in search of a genuine issue of triable fact" and instead "the nonmoving party [must] identify with reasonable particularity the evidence that precludes summary judgment . . . if the nonmoving party fails to discharge [its duty] by remaining silent – its opportunity is waived and its case wagered").

Initially, the mere fact that plaintiffs intend to attend future protests is insufficient to confer standing. See MacNamara v. City of N.Y., 275 F.R.D. 125, 132-41 (S.D. N.Y. 2011) (the plaintiffs in a putative class action challenging "indiscriminate mass arrests without individualized probable cause" during political demonstrations lacked standing to pursue declaratory relief where their evidence demonstrated only "that the alleged arrest and detention policies are ongoing [and] several class representatives plan to attend demonstrations in New York in the future") (citation and internal quotations omitted).

Even so, plaintiffs' evidence is too generalized to establish that the class, or even protestors more generally, are realistically threatened with a mass detention or kettling again in the future. Cf Lyons, 461 U.S. at 108 (assessing the "odds" that plaintiff would again be subject to precisely the same wrongful conduct – i.e., an illegal chokehold following a routine traffic stop – in evaluating subject matter jurisdiction); see also Index Newspapers LLC v. U.S. Marshals Serv., 977 F.3d 817, 825 (9th Cir. 2020) ("[a] plaintiff may not rely on mere conjecture about possible governmental actions to demonstrate injury, and must instead present concrete

evidence to substantiate their fears") (citation and internal quotations omitted); Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1339 (Fed. Cir. 2008) ("a case or controversy must be based on a real and immediate injury or threat of future injury that is caused by the defendants – an objective standard that cannot be met by a purely subjective or speculative fear of future harm") (emphasis removed).

Because plaintiffs abandoned any argument concerning past kettling events, there is simply no evidence in the record before the Court concerning any other mass detention situation involving the PPB. But see Nelsen, 895 F.2d at 1250-54 ("what a plaintiff must show is not a probabilistic estimate that the general circumstances to which the plaintiff is subject may produce future harm, but rather an individualized showing that there is a very significant possibility that the future harm will ensue," such that, where courts "have found standing to exist for a threat of future harm, it has consistently been determined that some systematic pattern, repetition or relationship exists") (citation and internal quotations omitted).

As a result, the undisputed evidence of record evinces no adequate "injury-in-fact" surrounding these individual defendants. This is especially true given that, since June 4, 2017, PPB has not engaged in any mass detentions or arrests, despite continuous nightly protests beginning on May 29, 2020, some of which involved violent, destructive activity. Dobson Decl. ¶¶ 6-8 (doc. 88); see also Index Newspapers, 977 F.3d at 821 (denoting protests in Portland, Oregon, following George Floyd's death have largely been peaceful, "but some have become violent [with] incidents of vandalism, destruction of property, looting, arson, and assault" and that "state and local authorities in Oregon have actively monitored the protests and engaged in crowd control measures"). The decision to employ a mass detention or arrest "requires significant officer resources" and is based on the specific facts confronting the Incident

Commander. Dobson Decl. ¶¶ 4, 9 (doc. 88); see also Wilker Decl. Ex. Z, at 21 (doc. 114-9) (City's response to IPR Report indicating PPB was in the process of revising its policies to prevent mass detentions or arrests not based on individualized reasonable suspicion/probable cause, and that PPB agrees "that mass detentions should only be carried out in extraordinary circumstances and at the direction of the Incident Commander"); Pub. Util. Comm'n of Cal. v. Fed. Energy Regulatory Comm'n, 100 F.3d 1451, 1460 (9th Cir. 1996) ("[w]hen resolution of a controversy depends on facts that are unique or unlikely to be repeated, the action is not capable of repetition and hence is moot") (citation omitted).

Further, the individual defendant that made the decision to detain plaintiffs – i.e., Graham – is no longer: (1) employed by the City, (2) working as a police officer, or (3) residing in Oregon. Graham Decl. ¶ 19 (doc. 89). Similarly, Lee is no longer employed by the City or residing in Portland, and the remaining individual defendants – McDaniel, Lindsey, and Santos – are no longer members of the Rapid Response Team, the body responsible for crowd management, nor do they participate in arrests at crowd control events. Lee Decl. ¶¶ 1-2 (doc. 91); Manlove Decl. Ex. 28, at 17-18 (doc. 94-28); McDaniel Decl. ¶ 7 (doc. 95).

Given these uncontested facts, plaintiffs do not demonstrate a disputed issue concerning whether there is a realistic likelihood that they would experience an unlawful mass detention or kettle by Graham or one of the other individual defendants, who acted at the direction of Graham. See Nelsen, 895 F.2d at 1251 ("no matter how important the issue or how likely that a similar action will be brought, a court is without jurisdiction [to issue prospective declaratory relief] if there is not a sufficient likelihood of recurrence with respect to the party now before it"). In particular, because plaintiffs have produced no evidence to show the specific conduct challenged in this action presently affects them or can reasonably be expected to affect them in

the future, the Court finds that intervening circumstances have forestalled any occasion to address plaintiffs' injury via declaratory relief. Defendants' motion should be granted as to plaintiffs' second, third, and fourth claims, as well as to the portions of their first claim that seek declaratory relief, and plaintiffs' partial motion as to their second claim should be denied.

### III.    Federal Declaratory Relief Claim Premised on a City Policy, Custom, or Practice

Even assuming it was justiciable, plaintiffs' third claim fails. A government entity may not be held vicariously liable for the unconstitutional acts of its employees under 42 U.S.C. § 1983. Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 692-94 (1978). To establish municipal liability, the plaintiffs must demonstrate that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the "moving force" behind the constitutional violation. Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted).

A plaintiff may establish that the policy, custom, or practice was the cause of injury in three ways: (1) "a city employee committed the alleged constitutional violation pursuant to [either] a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citations and internal quotations omitted).

Plaintiffs initially based their third claim on prior alleged incidents of unconstitutional PPB kettling. First Am. Compl. ¶¶ 16, 53 (doc. 45). In their opposition, however, plaintiffs abandoned this theory. Instead, although not explicit, plaintiffs appear to advance a theory of ratification based solely on six lines of Lee's deposition testimony. See Pls.' Resp. to Mot. Summ. J. 33 (doc. 113) (asserting that "the City in fact had a policy allowing officers to assess reasonable suspicion or probable cause on a group rather than individual basis") (citing Wilker Decl. Ex. V, at 35 (doc. 114-5)).

The specific testimony cited by plaintiffs is as follows:

Q: Was the conclusion in the after-action analysis that all of the police conduct on June 4th was consistent with Bureau policy?

A: Yes, sir.

Q: Was the conclusion that all of the police conduct on June 4th was lawful and constitutional?

A: Yes, sir.

Wilker Decl., Ex. V, at 35 (doc. 114-5).

Thus, Lee's testimony does not cite or discuss any particular PPB policy, nor does it identify any City or policy-making authority who conducted the "after action analysis." The only after-the-fact investigation before the Court that actually evaluates PPB's actions related to the June 4, 2017, detention (as opposed to those that merely summarize the events of the day) is the City's IPB Report from May 2018, which made clear that, at the time of plaintiffs' detention, PPB had "no written policy governing stops or other forms of temporary detention, including mass detentions [and] also does not have a mass arrest policy." Wilker Decl., Ex. Z, at 15 (doc. 114-9).

Furthermore, within the Ninth Circuit, an officer's "lack of individualized reasonable suspicion," "[s]tanding alone [does] not make the searches and seizures unlawful." Lyall v. City of L.A., 807 F.3d 1178, 1194 (9th Cir. 2015) (citation and internal quotations omitted). This is because, in the mass detention context, "individualized suspicion as to each person in the group . . . would impose 'an impossible burden' on police." Id. (quoting Carr v. Dist. of Columbia, 587 F.3d 401, 408 (D.C. Cir. 2009)); see also Bernini v. City of St. Paul, 665 F.3d 997, 1003 (8th Cir. 2012) ("[t]he touchstone of the Fourth Amendment is reasonableness under the particular circumstances presented. What is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons") (internal citations omitted).[14]

As a result, the Court has no basis to conclude Lee's testimony is indicative of a City of PPB policy, custom, or practice allowing officers to assess group reasonable suspicion or probable cause in an unconstitutional manner. This is especially true given that plaintiffs have not put forth argument or evidence relating to any other mass detention or kettling event, constitutional or otherwise. See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded

---

[14] Other courts examining this precise question have reached a different conclusion based on the same caselaw. See Dinler v. City of N.Y., 2012 WL 4513352, *6 (S.D. N.Y. Sept. 30, 2012) ("Carr and Bernini do not endorse a theory of collective or group liability, nor do they reflect a departure from the rule of individualized probable cause. They merely offer a method of reaching individualized probable cause in a large, and potentially chaotic, group setting. Individualized probable cause remains the lodestar in these cases"). Although plaintiffs advocate for a wholesale rejection of Lyall's holdings, this Court is bound by that decision as it is clearly on-point and remains good law. See Pls. Resp. to Mot. Summ. J. 27 (doc. 113) ("the Court should decline to apply Lyall to these facts" and instead find that "clearly established precedent requires individualized reasonable suspicion for their detention, which Defendants did not have").

upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy").

In sum, Lee's broad statements, without more, are insufficient to establish that a final policy-maker made a deliberate choice to endorse Graham's decision and the basis for it. See Sheehan v. City & Cty. of S.F., 743 F.3d 1211, 1231 (9th Cir. 2014), rev'd in part on other grounds sub nom., 135 S.Ct. 1765 (2015) (ratification "generally requires more than acquiescence," especially where "[t]here is no evidence in the record that policymakers made a deliberate choice to endorse the officers' actions") (citation and internal quotations omitted). For this additional reason, defendants' motion should be granted as to plaintiffs' Monell claim.

## III.    Federal Damages Claim Against the Individual Officers

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) the conduct complained of deprived him or her of an existing federal constitutional or statutory right; and (2) the conduct was committed by a state actor or a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted). It is undisputed that the individual police defendants qualify as state actors for the purposes of 42 U.S.C. § 1983.

Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). To determine whether a government actor is entitled to qualified immunity, the court evaluates, in no particular order, whether: (1) the alleged misconduct violated a right; and (2) that right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Here, the Court declines to evaluate whether plaintiffs' Fourth Amendment rights were violated because the latter issue is dispositive. A right is clearly established if its contours are

Page 29 – FINDINGS AND RECOMMENDATION

"sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citation and internal quotations omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741. The dispositive inquiry is whether the officers had "fair warning" that the detention was unlawful given the "particularized facts of the case." Id. at 740 (citation omitted); White v. Pauly, 137 S.Ct. 548, 552 (2017); see also Mullenix v. Luna, 136 S.Ct. 305, 308 (2015) ("[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate") (citation and internal quotations omitted).

It is undisputed that Graham, the sole decision-maker on the day in question, gave the order to detain marchers for disorderly conduct pursuant to Or. Rev. Stat. § 166.025[15] based on real time reports from multiple officers directly observing conditions on the ground, as well as contemporaneous media reports, video footage from PPB's airplane, and open sources such as YouTube and Twitter.[16] Wilker Decl. Ex. A, at 76-77, 84-85 (doc. 87-1); Graham Decl. ¶¶ 12-

---

[15] A person commits disorderly conduct "if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," he or she "[o]bstructs vehicular or pedestrian traffic on a public way." Or. Rev. Stat. § 166.025(1)(d). "Recklessly" is defined, in relevant part, as: "a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Or. Rev. Stat. § 161.085(9); see also State v. Ausmus, 336 Or. 493, 502-03, 85 P.3d 864 (2003) (applying § 161.085's definition of recklessness to § 166.025(1)).

[16] At various points throughout their briefing, plaintiffs intimate that Graham had no possible basis for the detention because he never actually observed conditions on the ground. See, e.g., Pl.'s Resp. to Mot. Summ. J. 2-3 (doc. 113). However, the collective knowledge doctrine "allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest." United States v. Villasenor, 608 F.3d 467, 475 (9th Cir. 2010). This doctrine applies to "aggregate the facts known to each of the officers involved . . . [w]hen there has been communication among agents" or "where an officer (or team of officers), with direct personal

13, 15-16 (doc. 89); Hughes Decl. ¶¶ 3, 8-11 & Exs. 45-48 (doc. 90); Lee Decl. ¶¶ 4, 6-7 (doc. 91); Manlove Decl. Ex. 4, at 74-75, 83-84, 130-31 (doc. 94-4); Manlove Decl. Ex. 7, at 121 (doc. 94-7).

The evidence Graham relied on plainly demonstrates that, from the time protestors left Chapman Square, many were openly and consciously violating the law. Graham Decl. ¶ 13 (doc. 89); Manlove Decl. Ex. 7, at 121-23 (doc. 94-7); Michaelson Decl. ¶¶ 57, 63 & Ex. 40 (doc. 96); see also Manlove Decl. Ex. 9, at 56-59, 61 (doc. 94-9) (Garrison testifying that there were not very many people on the sidewalk but many people in the street, such that traffic was impeded).

In particular, the video evidence shows hundreds of individuals walking in unison in the street, some of whom were holding banners, and periodically chanting together – e.g. "Whose streets? Our Streets!" or "All police are bastards!" Hughes Decl. ¶¶ 8-11 & Exs. 45-48 (doc. 90); Manlove Decl. Exs. 23-24, 27 (doc. 94); Manlove Decl. Ex. 26 (doc. 94-26). OSP and PPB officers observed the group first-hand interfering with traffic; the front of the march evinced "a dozen persons wearing all black clothing, walking in the street," immediately followed by "a group of people walking in the street holding a banner" and then "hundreds of people walking in the street." Manlove Decl. Ex. 15, at 72 (doc. 94-15); Terry Decl. ¶ 14 (doc. 100). To the extent people were observed on the sidewalk, they "appeared . . . to be a part of the march" and officers understood, based on past experience, that protestors fluidly moved between the street and the

---

knowledge of all the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." United States v. Ramirez, 473 F.3d 1026, 1032-33 (9th Cir. 2007) (citation and internal quotations omitted). As such, the fact that Graham remained in the EOC for the duration of the underlying events does not, in-and-of-itself, undermine the legitimacy of his decisions given the record before the Court.

sidewalk.[17] Manlove Decl. Ex. 7, at 124 (doc. 94-7); Manlove Decl. Ex. 9, at 57 (doc. 94-9);

Terry Decl. ¶ 14 (doc. 100); Suppl. Terry Decl. Exs. 65-66 (doc. 125).

Some of plaintiffs' testimony similarly confirms that they joined marchers in the street in

an effort to continue protesting, irrespective of vehicular traffic or public transportation, or the

existence of a permit. Manlove Decl. Ex. 10, at 78, 86, 106 (doc. 94-10); Manlove Decl. Ex.

17A, at 73 (doc. 94-17); Manlove Decl. Ex. 22, at 73, 80-82 (doc. 94-22). Notably, the video and

other evidence suggests that plaintiffs and other protestors knew that they did not have

permission to walk in the streets. See, e.g., Manlove Decl. Exs. 23-24, 27 (doc. 94); Terry Decl.

¶ 15 (doc. 100). Prior to and during the earlier parts of the protests, PPB gave explicit

instructions about what conduct would not be allowed and/or subject to arrest, including

unpermitted street marches. Dale Decl. ¶¶ 4-13 & Ex. 1 (doc. 86); Niiya Decl. ¶¶ 6-9 (doc. 97).

Plaintiffs nonetheless intimate that PPB played a part in "funnel[ing]" individuals into the

street or that protestors were, in fact, lawfully dispersing at the time of their detention. See, e.g.,

Wilker Decl. Ex. E, at 92-93 (doc. 87-5); Manlove Decl. Ex. 10, at 65-66 (doc. 94-10); Manlove

Decl. Ex. 25, at 63, 80, 93 (doc. 94-25); Nickolaus Decl. ¶ 9 (doc. 115); Garrison Decl. ¶ 4 (doc.

116); Whaley Decl. ¶ 6 (doc. 117); Haber Decl. ¶ 6 (doc. 118); see also Pls.' Resp. to Mot.

Summ. J. 22, 28 (doc. 113) (requisite intent under Or. Rev. Stat. § 166.025(1)(d) was lacking

because "many, if not most or all, of the Class Plaintiffs who walked north on Fourth Avenue did

so . . . with an intent to comply with the police's instructions"). The unrefuted evidence reflects

that police ordered protestors in Chapman and Lownsdale Squares to disperse to the north after

the demonstrations occurring therein were declared an unlawful assembly. Dale Decl. ¶ 13 & Ex.

---

[17] Based on the aforementioned facts, several officers testified that they believed individual reasonable suspicion existed in regard to the vast majority, if not all, of those detained. See, e.g., Wilker Decl. Ex. I, at 46 (doc. 87-9); Wilker Decl. Ex. J, at 33 (doc. 87-10).

1 (doc. 86). As Lee denoted, "a lawful dispersal requires immediately leaving the area, and do so in compliance with all traffic rules and regulations." Lee Decl. ¶ 8 (doc. 91); see also Manlove Decl. Ex. 28, at 126 (doc. 94-28) (Santos testifying that "the sidewalks were not blocked, so, I mean, anybody could just leave the area lawfully").

No serious argument can be made that plaintiffs reasonably believed that walking in the street (first west up Southwest Salmon Street – in contravention of police orders to disperse to the north – and finally north down Southwest 4th Avenue once they encountered a police blockage on Southwest Fifth Avenue) was permitted or consented to merely because the police attempted to divert a large and raucous crowd away from both the waterfront (wherein Rose Parade festivities were occurring) and the other lawful protests. Graham Decl. Ex. 3, at 2 (doc. 89-3); Manlove Decl. Ex. 7, at 101, 117 (doc. 94-7).

Indeed, the majority of plaintiffs testified that they were never instructed to walk in the street, and Garrison and Nickolaus indicated that they could have dispersed from the park via the sidewalk at any point. Manlove Decl. Ex. 9, at 60, 62-63 (doc. 94-7); Manlove Decl. Ex. 10, at 70, 76 (doc. 94-10); Manlove Decl. Ex. 17A, at 60-61 (doc. 94-17); Manlove Decl. Ex. 22, at 81 (doc. 94-22); Manlove Decl. Ex. 25, at 65-66, 78 (doc. 94-25). In addition, Nickolaus, Whaley, and Haber testified that they walked in the street intending to effectuate "civil disobedience" and the video evidence confirms their testimony. Manlove Decl. Ex. 17A, at 72 (doc. 94-17); Manlove Decl. Ex. 22, at 80 (doc. 94-22); Manlove Decl. Ex. 25, at 79 (doc. 94-25).

Nevertheless, plaintiffs are correct that PPB officers made "no effort to distinguish between" those potentially acting unlawfully and innocent bystanders before effectuating the detention. The Court is certainly troubled by defendants' actions, in that the record raises serious questions concerning whether the detention was based on a reasonable suspicion surrounding the

march, as opposed to the events that transpired earlier at Chapman and Lownsdale Squares (namely, throwing dangerous objects at officers). Pls.' Resp. to Mot. Summ. J. 4 (doc. 113); see also Wilker Decl. Ex. Z, at 9, 13 (doc. 114-9) (IPR Report finding there was "no record of a dispersal order or warning being given at Southwest 4th and Morrison" and "little documentation by the [PPB] describing the evidence supporting officers' reasonable suspicion of disorderly conduct prior to the mass detention," given the lack of "videos or reports showing that marchers obstructed vehicles or pedestrians or any other elements required by the disorderly conduct statute").

However, given the undisputed evidence of record, defendants are nonetheless entitled to qualified immunity given the totality of the circumstances. See Carr, 587 F.3d at 408-09 (rejecting plaintiffs' contention that "the police could not lawfully complete the mass arrest without first ordering the crowd to disperse and then giving plaintiffs an opportunity to comply" and further denoting that "[p]olice witnesses must only be able to form a reasonable belief that the entire crowd is acting as a unit . . . A requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible"); see also Dist. of Columbia v. Wesby, 138 S.Ct. 577, 588 (2018) (lower court erred by not "considering the facts as a whole [and instead taking] them one by one," and "dismiss[ing] outright any circumstances that were susceptible of innocent explanation") (citations and internal quotations omitted).

That is, Graham, at a minimum, reasonably but mistakenly could have believed that reasonable suspicion existed to detain the group present on Southwest 4th Avenue for parading without a permit or disorderly conduct considering: (1) the boisterous and rapidly evolving events on the day in question; (2) law enforcements' past experience with marchers; (3) the sheer

number of people involved (rendering it logistically impossible for officers to stop those directly observed in the street on an individual basis); and (4) other evidence tending to show that those detained were behaving as a unit, irrespective of whether all detainees actually were. See Lyall, 807 F.3d at 1195 ("[i]f a group or crowd of people is behaving as a unit and it is not possible (as it was in Ybarra) for the police to tell who is armed and dangerous or engaging in criminal acts and who is not, the police can have reasonable suspicion as to the members of the group"); see also Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983) (probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," such that even "innocent behavior [can] provide the basis for a showing of probable cause"). By extension, it was objectively reasonable for Lee, McDaniel, Santos, and Lindsey to believe that Graham had reasonable suspicion to issue the detention order based on the circumstances described herein.

Critically, plaintiffs have not cited to any authority even arguably indicating that defendants were on fair notice that their actions violated a clearly established law and the weight of relevant, persuasive authority is to the contrary. See Bernini, 665 F.3d at 1004-05 (granting qualified immunity to police officers in regard to innocent bystanders who "became intermingled [with unlawful protestors acting as a unit and who] were ultimately detained or arrested" as part of a kettle of approximately 400 people in a park); Burbridge v. City of St. Louis, 430 F.Supp.3d 595, 610-11 (E.D. Mo. Dec. 20, 2019) (granting qualified immunity on an unreasonable seizure claim where the plaintiffs, as media members, were present in the vicinity of a group of protestors in the street who had previously been dispersed from an unlawful assembly); see also Garcia v. Does, 779 F.3d 84, 96 (2015) ("[w]hether or not a suspect ultimately turns out to have a defense, or even whether a reasonable officer might have some idea that such a defense could exist, is not the question. An officer still has probable cause to arrest, and certainly is entitled to

qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful") (internal citations omitted).

Finally, it is undisputed that Graham's detention decision was premised, at least in part, on the legal advice he obtained from the City Attorney and Multnomah County Deputy District Attorney, who were present for consultation in the EOC and indicated that the detention could proceed lawfully for "blocking traffic." Graham Decl. ¶¶ 8, 15, 17 (doc. 89); Lee Decl. ¶ 4 (doc. 91); Manlove Decl. Ex. 4, at 151-52 (doc. 94-4); Manlove Decl. Ex. 36A, at 99-101 (doc. 94-36); see also Ewing v. City of Stockton, 588 F.3d 1218, 1231 (9th Cir. 2009) ("[a]lthough following an attorney's advice does not automatically cloak officers with qualified immunity, it can show the reasonableness of the action taken") (citations and internal quotations and brackets omitted). In sum, the Court cannot find that it would have been clear to an officer confronting an analogous situation in 2017 that his or her actions were "plainly incompetent or [a knowing violation of] the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Therefore, the individual officers are entitled to qualified immunity and defendants' motion should be granted.

## RECOMMENDATION

For the reasons stated herein, defendants' Motion for Summary Judgment (doc. 84) should be granted and plaintiffs' Partial Motion for Summary Judgment (doc. 85) should be denied. The parties' requests for oral argument should be denied as unnecessary. Judgment should be prepared dismissing this case.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate

Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 4th day of December, 2020.


_____ /s/ Jolie A. Russo _____
Jolie A. Russo
United States Magistrate Judge